## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM KERESTESY, | ) | CASE NO. 1:14-CV-01709 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, William Kerestesy ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On January 29, 2013, Plaintiff filed his applications for POD, DIB, and SSI, alleging a disability onset date of December 6, 2008.  (Transcript ("Tr.") 22.)  The claims were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.*)  On December 3, 2013, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On January

22, 2014, the ALJ found Plaintiff not disabled.  (Tr. 19.)  On June 23, 2014, the Appeals

Council declined to review the ALJ's decision, and the ALJ's decision became the

Commissioner's final decision.  (Tr. 1.)

On August 5, 2015, Plaintiff filed his complaint to challenge the Commissioner's

final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos.

12, 14.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in evaluating

the opinions of Plaintiff's treating physicians; and (2) the ALJ's residual functional capacity

determination fails to account for Plaintiff's use of a cane and his left arm impairment.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in July 1967 and was 41-years-old on the alleged disability onset

date.  (Tr. 36.)  He subsequently changed age category to a younger individual age 45-49.

(*Id.*)  He had at least a high school education and was able to communicate in English.

(*Id.*)  He had past relevant work as a truck driver.  (*Id.*)

### B.    Medical Evidence

#### 1.    Mental Limitations

On May 13, 2011, Farid Talih, M.D., Plaintiff's treating psychiatrist, completed a

mental functional capacity assessment.  (Tr. 357-358.)  Dr. Talih checked boxes indicating

that Plaintiff had marked to extreme limitations in every functional area.  (Tr. 357.)  Dr.

Talih was asked what observations and/or medical evidence led to his findings, and he

noted that Plaintiff was diagnosed with schizoaffectiev disorder (bipolar type) and was at a

high risk for decompensation.  (Tr. 358.)  Dr. Talih opined that Plaintiff was unemployable.

2

(*Id.*)

Plaintiff had a history of bipolar disorder, alcohol dependence, and intermittent suicidal ideations.  (Tr. 386.)  In January 2012, Plaintiff began treatment at Signature Health.  (Tr. 386.)  At that time, Plaintiff was taking prescription medication; however, he reported an increase in his symptoms in the last few months.  (*Id.*)  He reported several stressors including not having a job, chronic pain, and feeling irritable.  (*Id.*)  He stated that he dealt with the issues by watching television in his room or going fishing.  (*Id.*)  Plaintiff reported that he had thoughts of suicide but would never take his life.  (*Id.*)  At the examination, Plaintiff was alert and oriented times three and was cognitively intact, but he was dirty and disheveled.  (Tr. 387.)  He reported almost daily episodes of high irritability and impulsiveness.  (*Id.*)  The nurse suggested that Plaintiff see a psychiatrist.  (*Id.*)

Plaintiff continued treatment at Signature Health.  On February 1, 2012, Plaintiff saw Daniel Keaton, M.D.  (Tr. 389-391.)  Plaintiff complained that he was drained, tired, and anxious and had difficulty going out in public.  (Tr. 389.)  On examination, Plaintiff had fair-to-good grooming and hygiene, and he was pleasant and interactive.  (Tr. 390.)  His strength, tone, gait, and station were good-to-fair.  (*Id.*)  Dr. Keaton diagnosed depression, not otherwise specified (NOS); psychosis (NOS); anxiety (NOS); and alcohol dependence in sustained full remission.  (Tr. 391.)  Dr. Keaton ruled out bipolar disorder with psychosis; depression with psychosis; primary psychotic disorder; attention deficit hyperactivity disorder (ADHD); and panic disorder.  (*Id.*)  Dr. Keaton assigned a Global Assessment of Functioning (GAF) score of 50.[1]  (*Id.*)

---

[1]     The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness

3

On March 7, 2012, Dr. Keaton noted that Plaintiff's mood and anxiety was suboptimally controlled.  (Tr. 395.)  On March 30, 2012, Plaintiff returned to Dr. Keaton complaining that he was having a rough time.  (Tr. 397.)  Plaintiff reported that he was caring for three minor children, ages four, eighteen months, and seven weeks old.  (*Id.*) He stated that caring for the children was a "full-time job." (*Id.*)  By May 2012, Plaintiff reported that he was caring for six children.  (Tr. 399.)  He reported some depression and anxiety, which Dr. Keaton noted was "mostly situational." (*Id.*)  On July 5, 2012, Plaintiff's depression and anxiety were improved but he was easily confused about his medications (Tr. 401.)

Plaintiff saw Dr. Keaton again on August 1, 2012, for treatment of bipolar disorder with psychosis and anxiety NOS.  (Tr. 403.)  Plaintiff complained of chronic suicidal ideation without a plan, anxiety, stress, depressed mood, loss of interest, sleep disturbance, and feelings of hopelessness and helplessness.  (*Id.*)  On September 25, 2012, Plaintiff affirmed auditory hallucinations and exhibited abnormal thought content including depressive cognitions, anxious thoughts, and suicidal ideations.  (Tr. 405.)  On November 26, 2012, Plaintiff reported difficulty raising his children, chronic suicidal ideation, and auditory hallucinations.  (Tr. 407.)

On January 30, 2013, Dr. Keaton identified abnormal thought content including depressive cognitions, anxious thoughts, periods of irritability and anger, and thoughts of death and suicide.  (Tr. 410.)  Plaintiff reported that he dealt with his stress by having

---

devised by the American Psychiatric Association.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

someone else watch his children while he "drove for a few hours." (Tr. 409.) He also stated that his medication was "very helpful" in helping him handle his children. (*Id.*) Two months later, Plaintiff reported an exacerbation of symptoms. (Tr. 532.) He stated that he "needed a break and to visit friends and family in Pennsylvania" whom he had not seen in years. (*Id.*) He went to Pennsylvania and visited a friend from high school. (*Id.*)

In March 2013, state agency psychologist Jennifer Swain, Psy.D., reviewed Plaintiff's health records. (Tr. 165-168.) Dr. Swain concluded that Plaintiff was capable of understanding and remembering one to three step instructions; sustaining concentration and persistence on one to three step tasks in a setting void of fast pace; adapting to infrequent changes in a static work setting; and interacting with others on a superficial basis. (Tr. 167-168.) On July 22, 2013, state agency psychologist Mel Zwissler, Ph.D., reviewed Plaintiff's mental health records and affirmed Dr. Swain's findings. (Tr. 174-188.)

On October 17, 2013, Dr. Keaton completed a Medical Source Statement regarding Plaintiff's mental capacity. (Tr.  805-806.) Dr. Keaton noted that he had been treating Plaintiff since February 2012. (Tr. 806.) Dr. Keaton checked off boxes indicating that Plaintiff could rarely make occupational adjustments; rarely understand, remember, and carry out complex job instructions; occasionally understand, remember, and carry out detailed, but not complex, job instructions; frequently understand, remember, and carry out simple job instructions; and occasionally make personal and social adjustments. (Tr. 805-806.) When asked to identify the diagnosis and symptoms that supported his assessment, Dr. Keaton noted that Plaintiff had bipolar disorder type I, psychosis, and anxiety NOS. (Tr. 806.)

**2.      Physical Limitations**

5

Throughout the relevant period, Plaintiff was treated by primary care physician John Lee, D.O., for routine medical needs (tr. 339, 449); pain management specialist Bruce A. Piszel, M.D., for low back pain (tr. 415); and John Posch, M.D., for other orthopedic impairments (tr. 451).  Plaintiff had injections, radiofrequency on his cervical spine, participated in physical therapy, and used a TENs unit, braces, and a cane.  (Tr. 366-367, 677, 685-686, 692-697, 715-720.)  He also took prescription medication and had carpal tunnel surgery on his left hand, knee surgery in 2010, and ankle surgery in 1985.  (Tr. 472-474.)

On May 10, 2011, John Hill, M.D., evaluated Plaintiff for neck pain that radiated into his left arm and hand.  (Tr. 688.)  Plaintiff also reported that he had left knee pain and used a cane.  (*Id.*)  Dr. Hill diagnosed cervical spondylosis, degenerative disc disease, and foraminal stenosis.  (*Id.*)

On May 20, 2011, Dr. Lee completed a basic medical assessment.  (Tr. 555.)  Dr. Lee reported that Plaintiff had a history of neck and back pain and depression.  (*Id.*) He opined that Plaintiff could lift and carry up to 20 pounds and stand, walk, and sit for three hours in an eight-hour workday, for one hour without interruption.  (Tr. 356.)  Dr. Lee further opined that Plaintiff had moderate limitations in pushing, pulling, bending, reaching, handling, and performing repetitive foot movements.  (*Id.*)  He concluded that Plaintiff was unemployable.  (*Id.*)

Later that day, Plaintiff saw Dr. Posch, the surgeon who performed his knee surgery in April 2010.  (Tr. 554, 559.)  Plaintiff told Dr. Posch that he had numbness and tingling in his left hand.  (Tr. 554.) An electromyography (EMG) and nerve conduction study showed mild left carpal tunnel syndrome.  (*Id.*)  Plaintiff had carpal tunnel release surgery

6

in October 2011.  (Tr. 472-473.)  By November 2011, Dr. Posch reported that Plaintiff was doing "quite well."  (Tr. 458.)  He noted that Plaintiff had good grip strength and normal sensation.  (*Id.*)  Plaintiff reported minimal residual muscular discomfort in his hand, but Dr. Posch noted that it was "getting better" and advised Plaintiff that he would continue to improve over time.  (*Id.*)

On August 1, 2011, and January 23, 2012, Dr. Hill performed additional radiofrequency lesioning at the medial branch nerves at the C3-4, C4-5, and C5-6 levels and he diagnosed Plaintiff with cervical spondylosis and cervical degenerative disc disease.  (Tr. 677, 685.)

Plaintiff complained to Dr. Lee of ankle pain on March 14, 2012.  (Tr. 453.)  On March 19, 2012, Plaintiff reported increased ankle pain and swelling when up on it for any length of time.  (Tr. 451.)  Dr. Lee noted that x-rays showed a moderate degree of posttraumatic arthritis of the right ankle.  (*Id.*)  He advised Plaintiff to take over-the-counter anti-inflammatories as needed and wear an elastic ankle support.  (*Id.*)

On April 17, 2012, Dr. Lee saw Plaintiff for neck and back pain, bipolar disorder, and gastroesophageal reflux disease (GERD).  (Tr. 449.)  Dr. Lee referred Plaintiff to Bruce A. Piszel, M.D., his pain management specialist, for pain management.  (*Id.*)

Plaintiff first saw Dr. Piszel in June 2010.  (Tr. 415.)  Plaintiff's primary complaint was low back pain with radiation.  (*Id.*)  On a scale of one to 10, Plaintiff rated his pain as an eight.  (*Id.*)  He was not using any supportive devices or taking any prescription medication, but he was taking Aleve.  (Tr. 415-416.)  During the examination, Plaintiff exhibited some tenderness, muscle spasms, and decreased motion, but his gait, sensation, and strength were normal.  (Tr. 418-419.)  He was prescribed medication and

7

advised to follow up in three weeks.  (*Id.*)

Plaintiff continued to see Dr. Piszel.  In August 2012, Plaintiff reported that his medication relieved 50 percent of his symptoms.  (Tr. 424.)  On a scale of one to 10, however, Plaintiff rated his pain as an eight.  (*Id.*)  By November 2012, Plaintiff reported that his medication relieved only 25 percent of his symptoms.  (Tr. 428.)  Plaintiff received a bilateral lumbosacral medial branch block at L3-4 and L4-5 on November 9, 2012, and was diagnosed with spondylosis without myelopathy.  (Tr. 361, 366.)  On November 27, 2012, Plaintiff reported minimal relief on the left side and 75 percent relief on the right side. (Tr. 434.)  This continued through February 11, 2013.  (Tr. 436-439.)

In March 2013, state agency physician Eli Perencevich, D.O., reviewed Plaintiff's medical records.  (Tr. 165-168.)  Dr. Perencevich acknowledged that Plaintiff was being treated for chronic pain in his neck and back and claimed that he had limitations in lifting and standing.  (Tr. 165.)  Dr. Perencevich determined that the objective evidence did not support Plaintiff's allegations.  (Tr. 166.)  For instance, Plaintiff had mild tenderness in his cervical and lumbar spine and positive straight leg raising at one of his pain management appointments; however, Dr. Perencevich noted that Plaintiff's extremities, reflexes, and sensation were all within normal limits.  (Tr. 165.)  Dr. Perencevich did not give any weight to Dr. Lee's opinion, finding that it was not consistent with the evidence and concerned an issue that was reserved to the Commissioner.  (Tr. 166, 169.)  In July 2013, state agency physician Gary Hinzman, M.D., reviewed Plaintiff's medical records and affirmed Dr. Perencevich's findings.  (Tr. 174-190.)

In October 2013, a physician[2] completed a medical source statement regarding Plaintiff's physical capacity. (Tr. 807-808.)  The physician opined that Plaintiff could occasionally lift up to 10 pounds; frequently lift up to five pounds; and stand, walk, and sit for a total of two hours in an eight-hour work day for 20 minutes without interruption.  (Tr. 807.)  The physician further opined that Plaintiff could rarely perform postural activities other than fine and gross manipulation, which Plaintiff could perform on an occasional basis.  (Tr. 808.)  When asked what medical findings supported his or her opinion, the physician noted that Plaintiff had low back and neck pain and foraminal stenosis.  (Tr. 807-808.)  The physician also noted that Plaintiff needed to elevate his legs and take additional unscheduled breaks.  (Tr. 808.)  The physician reported that Plaintiff was prescribed a TENS unit and a cane.  (*Id.*)

**C.    Hearing Testimony**

   **1.    Plaintiff's Hearing Testimony**

Plaintiff brought a cane to his hearing.  (Tr. 53.)  He testified that he had been using his cane for the past two years.  (*Id.*)  He did not use it all the time; only when he needed to walk for more than 10 minutes.  (*Id.*)  Plaintiff stated that his cane was not prescribed by a physician, but that he got it because his "back gives out."  (*Id.*)

Plaintiff lived in a trailer with his wife, two biological teenage sons, and three young children who were his second cousins.  (Tr. 54.)  He testified that he helped with the feeding, dressing, and bathing of the three young children, as he had custody of them.  (Tr. 54-55.)  Plaintiff had a driver's license.  (Tr. 56.)  He was able to drive to doctor's

---

   [2]    The physician's signature on the report is illegible, although Plaintiff maintains that the report was completed by Dr. Lee.

appointments and to his son's school. (*Id.*) Plaintiff went grocery shopping with help from his sons. (*Id.*) He tried to sweep and cook, which he stated took a toll on his body. (*Id.*) On a typical day, Plaintiff would watch TV and do chores around the house as long as he was physically able. (Tr. 57.) He stated that he could not handle long periods of standing. (*Id.*)

Plaintiff testified that he suffered from anxiety and depression and was unable to concentrate. (Tr. 59.) He further stated that he was bipolar and had difficulty begin around other people. (*Id.*) He also had difficulty sleeping and used a CPAP machine every night. (Tr. 61.) Plaintiff testified that he took several medications for his mental health, and that his medications made him sleepy in the afternoon. (Tr. 62-63.) He stated that he experienced migraine headaches about five days per week. (Tr. 63.)

### 2. Vocational Expert's Hearing Testimony

Carol Mosley, a vocational expert, testified at Plaintiff's hearing. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience who would be capable of performing a limited range of sedentary work. (Tr. 70.) The individual would require a sit/stand option, defined as the ability to change position or stand up at will, provided the individual would not be off task more than 10 percent of the work period. (*Id.*) The individual could occasionally balance, crouch, crawl, kneel, stoop, and climb ramps and stairs, but could never climb ladders, ropes, or scaffolds. (*Id.*) The individual could occasionally operate bilateral foot controls and should avoid frequent exposure to excessive noise and occasional exposure to hazards such as operational control of moving machinery and unprotected heights. (Tr. 70-71.) The individual would have the capacity to understand and remember instructions to perform simple, repetitive

tasks.  (Tr. 71.)  The individual would have the capacity to sustain concentration and persistence to perform simple, repetitive tasks in a setting that does not require fast pace. (*Id.*)  Furthermore, the individual would have the capacity for superficial interactions and the ability to adapt to infrequent changes in a static work setting.  (*Id.*)  The VE testified that the hypothetical individual would be capable of performing such jobs as a bench assembler, an inspection worker, and a sorter.  (Tr. 72-73.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is

expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since October 28, 2011, the beginning of the unadjudicated period.

3. The claimant has the following severe impairments: history of cervical fusion, degenerative disc disease, left knee impairment, hearing loss in the left ear, sleep apnea, a history of right ankle surgery, left hand pain, depression, bipolar disorder, anxiety, and alcohol abuse.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he requires a sit-stand option defined as the ability to change position or stand up at will, provided that the claimant is not off task more than ten percent of the work period.  The claimant can occasionally balance, crouch, crawl, kneel, stoop, and climb ramps and stairs, but should never climb ladders, ropes, or scaffolds.  He can occasionally operate bilateral foot controls.  The claimant should avoid frequent exposure to excessive noise and should avoid occasional

exposure to hazards such as operational control of moving machinery and unprotected heights.  Mentally the claimant has the capacity to understand and remember instructions to perform simple, repetitive tasks.  The claimant has the capacity to sustain concentration and persistence to perform simple, repetitive tasks in a setting that does not require fast pace.  The claimant has the capacity for superficial interactions and the capacity to adapt to infrequent changes in a static work setting.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born in July 1967 and was 41-years-old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  The claimant subsequently changed age category to a younger individual age 45-49.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from December 6, 2008, through the date of this decision.

(Tr. 25-38.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc.*

13

*Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the

record to determine if the ALJ's decision is supported by substantial evidence, regardless

of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review

the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v.*

*Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

> The Commissioner's conclusions must be affirmed absent a determination that the

ALJ failed to apply the correct legal standards or made findings of fact unsupported by

substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th

Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a

preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by

substantial evidence will not be overturned even though substantial evidence supports the

opposite conclusion.  *Ealy*, 594 F.3d at 512.

> B.     **Plaintiff's Assignments of Error**

> > 1.     **The ALJ Erred in Evaluating the Opinions of Plaintiff's Treating**
> > **Physicians.**

> Plaintiff argues that the ALJ violated the treating physician rule with respect to Drs.

Keaton, Talih, and Lee.  "An ALJ must give the opinion of a treating source controlling

weight if he finds the opinion 'well-supported by medically acceptable clinical and

laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence

in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)

(quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a

treating source's opinion less than controlling weight, she must give "good reasons" for

doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See* *Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain her reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

### Dr. Keaton

Plaintiff argues that the ALJ improperly evaluated the opinion of Dr. Keaton, one of Plaintiff's treating physicians, because the ALJ failed to identify record evidence that conflicted with Dr. Keaton's opinion or explain which of Dr. Keaton's findings were unsupported by the record.  On October 17, 2013, Dr. Keaton completed a Medical Source Statement regarding Plaintiff's mental capacity.  (Tr.  805-806.)  The ALJ addressed Dr. Keaton's opinion in her hearing decision and assigned the opinion "some weight."  (Tr. 34-35.)  The ALJ explained:

> [Dr. Keaton's opinion] demonstrates the claimant's mental impairments cause him to experience functional limitations. However, less weight is accorded to this opinion as it is inconsistent with the records as a whole.  In fact, Dr. Keaton's own progress notes indicate the claimant is not as limited. Specifically, Dr. Keaton consistently described the claimant as alert and cooperative with good eye contact. Dr. Keaton reported the claimant interacted well, with full affect and normal thought process, insight and judgment.  The claimant also consistently reported taking care of five children, which further supports the finding the claimant's mental and physical impairments are not as

15

limiting as alleged.

(Tr. 35.)  Plaintiff maintains that "the Court has been deprived of meaningful review and remand is necessary to fully address Dr. Keaton's report."  (Plaintiff's Brief ("Pl.'s Br.") 16.)  The Court disagrees.

The ALJ did not err in assigning less than controlling weight to the opinion of Dr. Keaton, as she provided "good reasons" for doing so and substantial evidence supports her conclusion.  The ALJ did not dismiss Dr. Keaton's opinion without explanation.  Rather, she offered three different reasons for the weight she assigned to the October 2013 report:  (1) it was inconsistent with the record as a whole; (2) it conflicted with Dr. Keaton's progress notes; and (2) it conflicted with Plaintiff's reports of his ability to take care of five children despite his alleged impairments.  (Tr. 35.)  Importantly, the ALJ's detailed discussion of the evidence supports these reasons.  In assessing Plaintiff's residual functional capacity (RFC), the ALJ cited to specific exhibits and referenced treatment notes to support her conclusion that Plaintiff was not disabled despite his mental impairments.  (Tr. 31-35.)  The ALJ explained that Dr. Keaton's treatment notes generally noted that Plaintiff had good eye contact, interacted well, and had full affect, normal thought process, and good insight and judgment.  (Tr. 35, referencing Tr. 390, 395, 397, 400, 401, 404, 405, 408, 410, 530, 533, 535, 537.)  The ALJ also noted that although Dr. Keaton opined that Plaintiff could rarely maintain attention and concentration, respond appropriately to changes, and function independently (tr. 805-806), Plaintiff consistently reported that he took care of five children.  (Tr. 35.)  The ALJ further observed that treatment notes subsequent to May 2, 2012, indicated that Plaintiff's condition continued to improve despite medication noncompliance.  (Tr. 32.)  At a July 2012 visit with Dr. Keaton,

16

for example, Plaintiff denied any exacerbation of symptoms despite the fact that he had run out of medication, and Dr. Keaton determined that Plaintiff's depression and anxiety had improved.  (*Id.*)  The ALJ also noted that during a mental health visit on June 20, 2013, Plaintiff indicated that his medication regimen was working well and that he continued to care for his children.  (Tr. 33.)  The ALJ provided a lengthy discussion of the medical evidence before evaluating the opinion of Dr. Keaton.  (Tr. 28-35.)  The ALJ's discussion of the medical evidence was not merely a rote recitation of Plaintiff's longitudinal history; rather, the ALJ analyzed the medical evidence and explained how it supported her ultimate RFC determination.  (*Id.*)

Moreover, in arguing that Dr. Keaton's opinion is consistent with the record, Plaintiff notes that Dr. Keaton diagnosed Plaintiff with depression, psychosis, and anxiety.  (Pl.'s Br. 16.)  It is well established, however, that the "mere diagnosis" of a condition "says nothing" about its severity, or its effect on a claimant's ability to perform work.  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  Furthermore, Plaintiff maintains that Dr. Keaton's opinion is consistent with his treatment notes, which report that Plaintiff's "mood and anxiety was suboptimally controlled, that he was having problems with Child Protective Services, he had mild to moderate difficulties with thought content, depressive cognitions, suicidal ideations, thoughts of death, anger, irritability, auditory hallucinations, and anxious thoughts."  (Pl's Br. 16.)  The ALJ did not deny, however, that Plaintiff suffered from mental impairments.  Indeed, the ALJ specifically acknowledged that Dr. Keaton's opinion was entitled to "some weight" because it demonstrated that Plaintiff's mental impairments caused him to experience some functional limitations.  (Tr. 35.)

Finally, while Plaintiff presents evidence from Dr. Keaton to support his claim that

Dr. Keaton's opinion should be entitled to controlling weight due to its consistency with the record, this is not the appropriate standard to apply to the ALJ's decision.  An ALJ's decision that is supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.  As substantial evidence supports the ALJ's decision to assign less than controlling weigh to Dr. Keaton's opinion, Plaintiff's argument that the ALJ violated the treating physician rule as to Dr. Keaton is without merit.

### Dr. Talih

On May 13, 2011, Dr. Talih, Plaintiff's treating psychiatrist for approximately five years, completed a mental functional capacity assessment.  (Tr. 357-358.)  Dr. Talih opined that Plaintiff was markedly to extremely limited in several areas of functioning.  (Tr. 357.)  Plaintiff maintains that the ALJ erred in her evaluation of Dr. Talih's opinion, because the ALJ considered the opinion when determining Plaintiff's severe impairments, but failed to address the opinion again when determining Plaintiff's RFC.  Plaintiff's argument has no merit.

Contrary to Plaintiff's assertion, the ALJ specifically addressed Dr. Talih's May 2011 opinion when determining Plaintiff's RFC.  (Tr. 31-32.)  The ALJ summarized the opinion and assigned it "little weight," finding that the opinion was unsupported by the record.  (Tr. 31.)  The ALJ then offered several examples from the record to support her conclusion. (*Id.*)  She explained that Dr. Talih's opinion was inconsistent with Plaintiff's testimony of his overall level functioning, and she further discussed how the opinion was inconsistent with treatment records from Signature Health.  (*Id.*)  Thus, the ALJ adequately explained her reasons for assigning Dr. Talih's opinion less than controlling weight.

18

Furthermore, even if Plaintiff was correct in her assertion that the ALJ addressed Dr. Talih's opinion when determining Plaintiff's severe impairments but not when determining Plaintiff's RFC, Plaintiff would not be entitled to remand on that ground.  If the ALJ adequately evaluated Dr. Talih's opinion in determining Plaintiff's severe impairments, remanding Plaintiff's case for the ALJ's failure to repeat her analysis of Dr. Talih's opinion in her determination of Plaintiff's RFC would be a useless formality.  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766, n.6 (1969)).

### Dr. Lee

On May 20, 2011, Dr. Lee completed a basic medical report regarding Plaintiff's condition.  (Tr. 355-366.)  Dr. Lee opined, in part, that Plaintiff could lift and carry up to 20 pounds and stand, walk, and sit for three hours total in an eight-hour workday, for one hour without interruption.  (Tr. 356.)  Dr. Lee further opined that Plaintiff had moderate limitations in pushing, pulling, bending, reaching, handling, and performing repetitive foot movements.  (*Id.*)  He concluded that Plaintiff was unemployable.  (*Id.*)  The ALJ assigned "little weight" to Dr. Lee's opinion, finding that it was "inconsistent with the relatively unremarkable physical findings discussed above and the record as a whole."  (Tr. 35.)  Plaintiff argues that the ALJ erred in her analysis of Dr. Lee's May 2011 report, because

19

the ALJ disregarded evidence relating to Plaintiff's left upper extremity impairment and knee impairment.  Plaintiff maintains that the "ALJ's dismissal of Dr. Lee's report is not justified in light of the objective evidence."  (Pl.'s Br. 18.)  The Court disagrees.

Contrary to Plaintiff's assertion, the ALJ adequately acknowledged that Plaintiff ambulated with a cane, had surgery on his knee, had an MRI that showed "slight" ventral indentation of the spinal cord, medial blocks, a cervical fusion, and lumbosacral spondylosis without myelopathy.  (Tr. 29-31.)  Despite that evidence, the ALJ determined that Dr. Lee's May 2011 opinion was inconsistent with the relatively unremarkable physical findings found in the record, including recent treatment records showing that with proper pain management treatment, Plaintiff's symptoms improved.  (Tr. 35.)  Moreover, even if the ALJ failed to discuss all of the clinical findings that may or may not support Dr. Lee's report, the Court would not reverse Plaintiff's case on that ground alone, as an ALJ can consider all the evidence without directly addressing in her written decision every piece of evidence submitted by a party.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)).

Plaintiff also argues that the ALJ erred by "mischaracteri[zing] Dr. Lee's medical source statement of October 23, 2013 as that of an unknown physician with an illegible signature."  (Pl.'s Br. 19.)  According to Plaintiff, the ALJ "made no attempt to discern who authored this report and did not inquire of counsel or claimant at the hearing regarding her confusion as to the report's preparation."  (*Id.*)  Plaintiff maintains that the ALJ's failure to inquire into the preparation of the October 2013 report and to resolve any conflict as to the authority of the report constitutes reversible error.  Plaintiff's argument has no merit.

First, as the Commissioner notes in her Brief, Plaintiff assumes that Dr. Lee authored the October 2013 report (tr. 807-808) because the report "reveals a similar handwriting and signature" as Dr. Lee's May 2011 report.  (*Id.*)  Plaintiff offers no evidence, however, that the October 2013 report was actually authored by Dr. Lee.  Furthermore, the ALJ did not err in her assessment of the opinion, because even though the signature on the report was illegible, the ALJ evaluated it nonetheless and concluded that the record did not support the "extreme limitations" assessed in the report. (Tr. 35.)  The ALJ compared the opinion to pain management notes from Dr. Piszel and progress notes from Dr. Hill, which showed that Plaintiff's pain symptoms were well managed with proper treatment. (*Id.*)  The ALJ also explained that recent treatment notes showed that Plaintiff rated his neck pain as a one to two on a scale of 10, and mental health treatment notes consistently described Plaintiff's strength, tone, gait, and station as good to fair.  (*Id.*) The ALJ further noted that at an August 2013 visit with Dr. Hill, Plaintiff's physical examination was unremarkable and no neuro sensory deficits were noted.  (*Id.*)  Thus, despite the fact that the ALJ did not identify the author of the October 2013 report, she adequately explained her reasons for assigning little weight to the opinions contained in the report.

Accordingly and for the foregoing reasons, the ALJ did not err in her assessment of opinions from Drs. Keaton, Talih, or Lee.

> **2.     The ALJ's Residual Functional Capacity Determination Fails to Account for Plaintiff's Use of a Cane and His Left Arm Impairment.**

Plaintiff argues that the ALJ reached a determination that Plaintiff can perform a limited range of sedentary work without accurately evaluating Plaintiff's upper extremity limitations or addressing his use of a cane.  Plaintiff maintains that because there is

21

evidence that he has had significant upper extremity difficulties due to carpal tunnel syndrome and cervical disc disease, and because the record reflects that he ambulates with a cane, the ALJ should have assessed additional limitations beyond those included in the ALJ's RFC determination.  For the following reasons, Plaintiff's argument is without merit.

RFC is an indication of a claimant's work-related abilities despite his limitations. See 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  See 20 C.F.R. § 416.945(e). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p. While RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  See Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], when the claimant is proving the extent of his impairments.")

Here, Plaintiff argues that the ALJ erred by failing to consider the impact Plaintiff's carpal tunnel syndrome, cervical spondylosis, degenerative disc disease, and foraminal stenosis has on his ability to use his upper extremities.  (Pl.'s Br. 20.)  As the Commissioner notes in her Brief, however, the ALJ explained, in detail, why Plaintiff's carpal tunnel syndrome did not require additional limitations beyond those included in

Plaintiff's RFC.  For instance, the ALJ acknowledged that Plaintiff underwent left carpal

tunnel release surgery on October 4, 2011 (tr. 29, citing tr. 362, 460, 472.), but that 10

days after Plaintiff's procedure he reported good relief of his symptoms (tr. 29, citing tr.

459).  By November 2011, Dr. Posch, Plaintiff's surgeon, noted that Plaintiff was doing

quite well and had good grip strength and normal sensation.  (Tr. 458.)  Dr. Posch noted

that Plaintiff had minimal residual muscular discomfort in the hand but was improving, and

he advised Plaintiff that his condition would improve over time.  (*Id.*) Dr. Posch explained

that he would see Plaintiff's on an "as needed" basis, but the record does not appear to

contain treatment records indicating that Plaintiff returned to Dr. Posch complaining of

symptoms associated with carpal tunnel after November 2011.  Additionally, while Plaintiff

complained that he had problems using his hands, his physical examinations were

unremarkable and did not show a worsening of his condition.  (Tr. 458.)  Thus, the ALJ

adequately considered Plaintiff's carpal tunnel syndrome, and evidence in the record

supports her decision not to include specific limitations regarding Plaintiff's carpal tunnel

syndrome in Plaintiff's RFC.

Furthermore, the ALJ specifically addressed Plaintiff's alleged arm pain in her

hearing decision, noting: "While subsequent records show the claimant experienced left

arm pain, the record indicates this related to his neck impairment discussed in detail

below."  (Tr. 29.)  The ALJ then offered a detailed discussion of the record evidence

relating to Plaintiff's neck pain, and ultimately determined that Plaintiff was not limited in

his ability to push, pull, bend, reach, handle, or perform fine and gross manipulation.  (Tr.

29-31.)  Additionally, the ALJ addressed Dr. Lee's May 2011 opinion that Plaintiff was

moderately limited in his ability to push/pull, bend, reach, and handle, and explained why

23

she assigned "little weight" to the opinion.  (Tr. 35.)  As substantial evidence in the record, discussed in detail by the ALJ in her decision, supports the ALJ's RFC determination, Plaintiff's argument that the ALJ failed to account for his alleged left upper extremity impairments is without merit.

Finally, Plaintiff argues that the ALJ failed to recognize or consider that he used a cane.  In her hearing decision, however, the ALJ explicitly acknowledged that Plaintiff brought a cane to his hearing, and that he testified that the cane was not prescribed and that he only used it to walk long distances.  (Tr. 34, 53.)  Plaintiff fails to offer any explanation for why Plaintiff, who testified that he used a cane only when walking long distances, would be incapable of performing work at the sedentary exertional level.  For the reasons discussed above, Plaintiff's second assignment of error does not present a basis for remand of Plaintiff's case.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 1, 2015